***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law, the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer on or about 9 October 2000, the date of the alleged injury by occupational disease.
3. The Amerisure Insurance Company was the workers' compensation carrier on the risk at all relevant times herein.
4. Plaintiff's average weekly wage as set forth on the Form 22 Wage Chart is $459.55, yielding a compensation rate of $306.37 per week.
5. The parties stipulated into evidence the following documents:
 The Pretrial Agreement Stipulated 1 Industrial Commission Forms Stipulated 2 Form 22 Stipulated 3 Medical Records Stipulated 4 NC Vocational File Stipulated 5 Med Central Medical Records Stipulated 6
6. Plaintiff tendered the following Exhibits during the hearing which were admitted into evidence:
 Plaintiff's Exhibit 1 Production Sheet Plaintiff's Exhibit 2 Welting Plaintiff's Exhibit 3 Upholstery Fabric with Zipper Plaintiff's Exhibit 4 Chart of Wage Loss Plaintiff's Exhibit 5 Pay Stubs Supporting Wage Chart Plaintiff's Exhibit 6 North Carolina Vocational Rehab Work Restriction Sheet Plaintiff's Exhibit 7 Out of Work Notes Plaintiff's Exhibit 8 Letters from Amerisure regarding Claim dated 27 October 2000 Plaintiff's Exhibit 9 Video Tape of Job
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACTS
1. Plaintiff, who is right-handed, was born on 31 January 1970. She completed the seventh grade, and testified that she has problems reading or doing simple mathematics.
2. The North Carolina Vocational Rehabilitation sent plaintiff to night school to help her become eligible to take a course in preparation for taking the GED.
3. Plaintiff began working for defendant-employer on 9 March 1999. She was hired as a sewer of upholstery. She has worked as a sewer for various employers since she was 18 years old.
4. As a sewer, plaintiff uses a Jukie sewing machine which automatically pulls the fabric through the machine. Plaintiff has to guide the fabric being sewn with her hands to ensure that the fabric is sewn correctly. Plaintiff must use her wrists and hands to twist and turn the fabric as she sews with the machine. There are several different types of seat cushions that plaintiff must make. Some are simple squares called "rollover" cushions, and some have "ears" on the seat cushion which form a "T".
5. Plaintiff's workstation is U-shaped. The sewing machine table with the sewing machine built in is approximately 4 feet by 4 feet. There is a table on each side of the sewing machine table. One table is used to hold work, and the other one is used to hold plaintiff's production sheet.
6. Plaintiff is a production employee. She is paid per piece for cushions constructed as set forth on the production sheet. Plaintiff picks a bundle of pre-cut fabric each morning to begin her work making cushions. She must construct the entire cushion. Sometimes she must make her own welting and sew the welting onto the cushion pieces. She sews the top to the sides of the cushion, and then sews the bottom on the cushion. She is required to trim curves and turn each cushion right-side out after the cushion is completely constructed. She does not usually install the zippers on the cushions; the zipper is installed on the fabric by another employee prior to beginning her work on constructing each cushion.
7. A rollover cushion is worth $.48 per cushion, and plaintiff can make approximately 240 per day, but she never does just this one task all day, every day. An ear cushion is worth $2.50 per cushion, and plaintiff can make approximately 40-70 cushions per day, but she never does just this one task all day, every day.
8. Plaintiff must thread her own machine, which requires her to thread it through three tensions and then through the needle. She must also thread her bobbin. This is not required very often during the day. Plaintiff contends that her work requires a lot of flexion and extension of her wrists.
9. Plaintiff testified that she has observed other employees who sew for defendant-employer who have had cysts appear on their hands. Plaintiff has also observed other employees wearing braces on their wrists. Plaintiff's supervisor, Teresa Hall, agreed that she had seen at least one other employee wearing a brace on her wrist at work.
10. On 9 October 2000, plaintiff began work at 7:00 a.m. While sewing, plaintiff felt a pop in her left wrist and a knot developed on her left hand, accompanied by an onset of pain. Plaintiff reported the injury to Ms. Hall, who escorted plaintiff to the office of Supervisor Terry Miller. Ms. Hall offered to take plaintiff to a doctor but Mr. Miller refused to allow her to accompany plaintiff and told plaintiff that if she needed to go to a doctor she would have to transport herself. Plaintiff left work and went to the company doctor at MedCentral where it was determined that she had a ganglion cyst. The physician at MedCentral was unable to determine whether the cyst was the result of a repetitive work injury. Plaintiff was given an injection and written out of work until 11 October 2000. Upon her return to work, the MedCentral physician recommended that plaintiff be permitted to wear a brace on her wrist and do no heavy lifting.
11. Plaintiff next saw Dr. Peter Dalldorf, an orthopedic surgeon, who treated her from 25 October 2000, through 19 December 2001. Following the initial examination, Dr. Dalldorf noted a positive Tinel's sign at the left wrist and diagnosed plaintiff with a ganglion cyst and probable carpal tunnel syndrome. He wrote plaintiff out of work until 13 November 2000. At the 13 November 2000 examination, Dr. Dalldorf again noted a positive Tinel over the left carpal tunnel and as a result, ordered an EMG nerve conduction study.
12. The EMG tests were performed by Dr. Albert K. Bartko, a specialist in physical medicine and rehabilitation. Dr. Bartko examined plaintiff on 21 November 2000. The EMG results were within normal limits, but Dr. Bartko noted that "her symptoms and exam are suspicious for carpal tunnel syndrome and she is in high-risk job for that." He suggested a repeat study should plaintiff's symptoms continue to evolve.
13. Plaintiff returned to Dr. Dalldorf with the EMG results and Dr. Dalldorf diagnosed her with left basal joint inflammation and a left wrist ganglion cyst. He noted that the results of the tests did not rule out the possibility of carpal tunnel syndrome, but primarily served to determine whether plaintiff suffered from severe carpal tunnel necessitating immediate surgical intervention. Dr. Dalldorf decided to continue plaintiff on conservative treatment and recommended that she attempt to return to work wearing a brace on her left wrist.
14. Plaintiff returned to work wearing the brace while she sewed. On 12 January 2001, she returned to Dr. Dalldorf with complaints of terrible pain shooting up her wrist. Following an examination, Dr. Dalldorf diagnosed plaintiff's condition as "left wrist dorsal ganglion cyst," which plaintiff asked to have removed surgically. Dr. Dalldorf performed surgery on plaintiff's left wrist on 23 January 2001 and released her to return to regular duty work on 10 April 2001. He assigned a 5% permanent partial disability rating to plaintiff's left arm.
15. Dr. Dalldorf continued to follow plaintiff's progress following her surgery. On 16 February 2001, plaintiff was still wearing a brace on her left wrist and was "very still and limited in motion with some discomfort." Dr. Dalldorf found the incision to be well healed with no sign of infection, no recurrent cyst and no swelling over the incisional site. He recommended that plaintiff begin physical therapy, and wrote her out of work for the next two to three weeks.
16. Plaintiff began physical therapy on 21 February 2001, at Bray-Maness Physical Therapy, Inc. The initial evaluation record notes that plaintiff was referred by Dr. Dalldorf with a diagnosis of "s/p cyst excision; carpal tunnel left wrist and hand."
17. On 9 March 2001, plaintiff returned to Dr. Dalldorf. As a result of physical therapy, plaintiff was gaining motion in her wrist but still having discomfort. Dr. Dalldorf wrote a note at that time which stated on the line marked "diagnosis" that plaintiff had "carpal tunnel" [syndrome], and that she could return to work so long as she did not have to use her left arm; otherwise, her out of work status would be continued.
18. By 30 March 2001, Dr. Dalldorf indicated that plaintiff was back at work doing right hand work only, but that she was able to use her left hand "to a limited degree." Plaintiff was no longer using the brace and was off pain medications at that time. In a return to work note, Dr. Dalldorf again stated that plaintiff was diagnosed with carpal tunnel syndrome and that she was limited to right hand work until 10 April 2001, at which time she could return to regular duty work.
19. On 9 May 2001, plaintiff presented to Dr. Dalldorf with pain symptoms in her right hand. She had been back at regular duty work, and reported that she had no numbness or tingling at night, but that the pain occurred while she was working. An examination revealed no radicular symptoms and no evidence of radial tunnel. Dr. Dalldorf gave plaintiff some medication for the pain in her right forearm, and released her from his care to return if needed. He noted that if asked he would give plaintiff a permanent partial disability rating of 5% to her left wrist due to the cyst excision.
20. On 28 September 2001, plaintiff presented to Dr. Dalldorf with complaints of difficulty with her left hand. Upon examination, Dr. Dalldorf found the tips of three fingers "were ice cold and very pale." Based upon the examination, Dr. Dalldorf diagnosed plaintiff with possible Raynaud's syndrome and referred her to Dr. Shaili Deveshwar, a rheumatologist. Dr. Deveshwar examined plaintiff on 16 October 2001 and again on 6 November 2001. Based upon her examinations, Dr. Deveshwar found "no evidence of synovitis or synovial thickening over any of plaintiff's joints and no evidence of Raynaud's phenomenon." Dr. Deveshwar wrote to Dr. Dalldorf that she could not determine the etiology of plaintiff's problems.
21. On 13 November 2001, plaintiff returned to Dr. Bartko for a repeat of the EMG study. Plaintiff gave a history of having returned to work in April, which increased the use of her hands. Besides a worsening of her old left hand symptoms, plaintiff was noting numbness and tingling in the right upper extremity and trapezius pain bilaterally. Again, the EMG study results were within normal limits. Dr. Bartko opined that plaintiff "would appear to have some myofascial pain involving the trapezius bilaterally." Dr. Bartko testified that although the trapezius pain could also be the result of a repetitive motion occupation, it was not likely to be a continuation or movement to other parts of the body of symptoms related to carpal tunnel. He recommended physical therapy and a TENS unit.
22. On 19 December 2001, plaintiff had her last visit with Dr. Dalldorf. He reviewed plaintiff's care with Dr. Bartko and examined plaintiff who had a negative Tinel's sign over her median nerve. Dr. Dalldorf opined that this was probably indicative of plaintiff's carpal tunnel being asymptomatic due to plaintiff's being out of work, rather than evidence that she no longer had carpal tunnel syndrome. Dr. Dalldorf's diagnoses of plaintiff's conditions during the course of his treatment included a ganglion cyst which he removed, bilateral carpal tunnel syndrome and myofascial pain syndrome.
23. Dr. Dalldorf opined that plaintiff's job as a sewer placed her at an increased risk over that of the general public of developing a ganglion cyst, carpal tunnel syndrome and myofascial pain, and that plaintiff's job was a significant contributing factor in the development of those conditions. He recommended that although plaintiff's carpal tunnel syndrome had not progressed to the point of requiring surgical intervention, plaintiff should avoid repetitive jobs in general and sewing jobs in particular in order to keep her condition from worsening.
24. Dr. Bartko continued to treat plaintiff and by 2 January 2002, plaintiff felt she was improving with physical therapy. Plaintiff remained out of work and Dr. Bartko noted that in order for plaintiff to return to work, she would have to find a job which was "much less repetitive."
25. On 21 February 2002, plaintiff returned to Dr. Bartko with complaints of increased pain. Dr. Bartko noted that plaintiff had been subject to a number of outside "stressors," including her husband leaving her to care for their three children alone, the possible loss of their house, and problems with her workers' compensation claim. Dr. Bartko noted that "it is normal to have increased perception of pain in those conditions." On 25 February 2002, plaintiff underwent a repeat EMG study of the left upper extremity, due to the persistence of her symptoms. The study was normal, providing no evidence of median entrapment neuropathy at the wrist or more proximally in the forearm, and no evidence of cervical radiculopathy. Dr. Bartko did not release plaintiff to return to work at that time, nor did he release plaintiff from his care or find plaintiff to be at maximum medical improvement. Dr. Bartko has not seen plaintiff since the 25 February 2002 visit due, in his opinion, to plaintiff's lack of financial means to pay for treatment.
26. When given a hypothetical description of plaintiff's job duties which accurately corresponded with plaintiff's testimony, Dr. Bartko opined that plaintiff's job duties were a significant contributing factor in the development or onset of plaintiff's myofascial pain syndrome, and that her job placed her at an increased risk over that of the general public of developing those symptoms. The Full Commission notes that Dr. Bartko testified that he has treated "numerous seamstresses in the past," as well as seeing "a lot of people out of the textile/furniture industry." Therefore, the Full Commission gives great weight to the testimony and opinions of Dr. Bartko.
27. On 4 March 2002, upon referral from Dr. Bartko, plaintiff presented to adult psychiatric and mental health nursing specialist, Ms. Bonnie Sue Kennedy, R.N. Following an examination of plaintiff, Ms. Kennedy diagnosed plaintiff with major depression and intermittent panic attacks. Ms. Kennedy referred plaintiff to Dr. Rupinder Kaur for a medical evaluation and scheduled a return visit in one month. Ms. Kennedy noted that she would have liked to see plaintiff sooner, but the treatment was dictated in part by plaintiff's lack of ability to pay for the sessions. Plaintiff did not return to Ms. Kennedy for further treatment.
28. Ms. Kennedy opined that plaintiff's condition was primarily brought about because of the 9 October 2000 injury and the resulting workers' compensation claim. She further opined that plaintiff's prognosis is reasonably good and she should know more following the resolution of the workers' compensation claim.
29. Plaintiff was out of work from 9 October 2000 through 13 November 2000. Plaintiff returned to work from 14 November 2000, to 22 January 2001, was out again from 23 January 2001 through 8 March 2001, and performed one-handed work from 9 March 2001, to 10 April 2001. She performed full duty from 10 April 2001, to 6 November 2001, and has been unable to return to her job as a sewer since that date and continuing.
30. Plaintiff's employment with defendant-employer significantly contributed to the development of her ganglion cyst, carpal tunnel syndrome and myofascial pain syndrome, which are occupational diseases. Plaintiff's job duties placed her at an increased risk of developing these conditions. Plaintiff's depression was a direct, natural consequence of her occupational diseases. Plaintiff has not reached maximum medical improvement from these conditions with the exception of the ganglion cyst.
31. Plaintiff's average weekly wage is $459.55, yielding a compensation rate of $306.37 per week.
 ***********
Based upon the foregoing Stipulations and Findings of Facts, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of plaintiff's employment with defendant-employer, plaintiff has contracted the following compensable occupational diseases: a ganglion cyst, carpal tunnel syndrome and myofascial pain syndrome. Plaintiff's conditions were due to causes and conditions peculiar to and characteristic of her employment, and her employment with defendant-employer as a sewer placed her at an increased risk of developing these conditions as compared to members of the general public not so employed. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's depression flowed directly from and is a direct and natural consequence of her compensable occupational disease, and so is compensable under the Act. N.C. Gen. Stat. § 97-2.
3. As a result of plaintiff's occupational diseases, she was totally disabled from employment beginning on 9 October 2000 through 13 November 2000, from 23 January 2001 through 8 March 2001, and from 6 November 2001 through the present and continuing. Plaintiff is entitled to temporary total disability compensation at a rate of $306.37 per week for these periods of time. N.C. Gen. Stat. § 97-29.
4. Plaintiff performed one-handed work from 9 March 2001 to 10 April 2001 and earned diminished wages. She is entitled to temporary partial disability compensation for this period of time in accordance with N.C. Gen. Stat. § 97-30.
5. Plaintiff is entitled to have defendants pay for all medical expenses incurred and to be incurred in the future for treatment related to her ganglion cyst, carpal tunnel syndrome, depression and myofascial pain syndrome. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Stipulations, Findings of Facts and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the weekly rate of $306.37 for the periods from 9 October 2000 through 13 November 2000, 23 January 2001 through 8 March 2001, and from 6 November 2001 through the present and continuing until further Order of the Commission. The amount which has accrued shall be paid in a lump sum. Payments pursuant to this Paragraph shall be subject to attorney's fees approved below.
2. Defendants shall pay plaintiff temporary partial disability compensation in the amount of two thirds of the difference between the wages she earned and her pre-injury wages for the period of 9 March 2001 to 10 April 2001. This compensation shall be paid in a lump sum, subject to attorney's fees approved below.
3. Defendants shall pay all medical expenses incurred by plaintiff and to be incurred in the future which are reasonably related to her depression and to her compensable occupational diseases of a ganglion cyst, carpal tunnel syndrome and myofascial pain syndrome, when bills are submitted in accordance with Industrial Commission procedure.
4. An attorney's fee of 25% of the compensation awarded to plaintiff in Paragraphs 1 and 2 above is hereby approved for plaintiff's counsel. Defendants shall pay directly to plaintiff's counsel one fourth of the lump sum payments awarded to plaintiff, and thereafter every fourth payment of compensation shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs of this action.
 *********** ORDER
Plaintiff's motion to reopen the record in this case to admit further evidence in the form of additional deposition testimony is hereby DENIED.
This the ___ day of August, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER